**Megan L. Dishong**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**105 E. Pine**
**Missoula, MT 59802**
**Phone: (406) 542-8851**
**FAX: (406) 542-1476**
**Email: Megan.Dishong@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CV-14-   -BU-** |
| **Plaintiff,** | |
| **vs.** | **COMPLAINT** |
| **JACLYN KATZ and ALL REAL ESTATE SERVICES IN MONTANA,** | |
| **Defendants.** | |

The United States of America alleges as follows:

## NATURE OF ACTION

1.     The United States brings this action to enforce Title VIII of the Civil Rights

Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42

U.S.C. §§ 3601 *et seq.* ("Fair Housing Act").  This action is brought on

behalf of Kristen Newman and Montana Fair Housing, pursuant to 42 U.S.C. § 3612(o).

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 3612(o).

3.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events or omissions giving rise to the United States' claims occurred there, all Defendants reside there, and the property that is the subject of this suit is located there.

## PARTIES AND PROPERTY

4.     Defendant Jaclyn Katz is a real estate agent and broker who resides in Bozeman, Montana, in the District of Montana.

5.     Defendant All Real Estate Services in Montana, LLC ("ARESM") is a corporation organized under the laws of Montana, with its principal place of business in Bozeman, Montana.   Defendant Jaclyn Katz is the principal and sole owner of ARESM.

6.     Defendants are in the real estate business in the Bozeman area. Among other things, they own and/or manage residential rental properties in and around Bozeman.  Among the properties owned and managed by Defendants is a

four-unit apartment complex located at 305 South 16th Avenue in Bozeman, hereinafter referred to as the Subject Property.

7.   With respect to the Subject Property, Defendant Jaclyn Katz is responsible for, among other things, showing apartments to prospective renters, processing rental applications, preparing and executing leases, receiving and making determinations related to tenants' requests for reasonable accommodations, and performing other managerial and administrative tasks.

8.   The Subject Property and the other residential properties owned or managed by Defendants are "dwelling[s]" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

## FACTUAL ALLEGATIONS

9.   At all relevant times, Kristen Newman has had a disability as defined by the Fair Housing Act, 42 U.S.C. § 3202(h).  She experiences symptoms from a traumatic brain injury, which include post-traumatic stress disorder ("PTSD"), severe anxiety, and severe migraine headaches.  These conditions substantially impair her ability to interact socially and communicate with other persons.

10.  Montana Fair Housing  is a Montana nonprofit corporation, whose organizational purposes are to promote equal housing opportunities and eliminate illegal housing discrimination in the State of Montana.

11.  In approximately October 2012, at the recommendation of her neurologist, Ms. Newman acquired a dog named Riley to begin training as her service dog.   Riley has been trained to perform and performs tasks that help Ms. Newman cope with the effects of her PTSD and severe anxiety, and that help alert her to the first signs of an impending migraine.   At the time that Ms. Newman acquired Riley, she also had a dog named Bower and a cat named Chloe, who served as emotional support animals for Ms. Newman.

*Defendants' Policies Regarding Service Animals and Pets*

12.  Defendants allow pets in the rental units they own and managed. Defendants charge a deposit for each pet living with a tenant.  At the time that Ms. Newman first sought to rent an apartment from Defendants, the required deposit was $250 for a dog and $100 for a cat.

13.   In November of 2012, Newman approached Ms. Katz seeking to rent an apartment at the Subject Property.

14.  Ms. Newman told Ms. Katz that she owned three animals.   She told Ms. Katz that Riley was a service animal in training and that Riley had been born in May of 2012.

15.  Ms. Katz told Ms. Newman that she did not ordinarily allow dogs younger than a year old, but that she would make an exception for Riley because he was a service animal.  She also said she would require a deposit of $1000 for

Riley, but would refund the excess over $250 when he turned a year old if he had not caused damage.

16.   Ms. Katz did not, then or later, question whether Ms. Newman had a disability or whether Riley was her service animal, and did not request any documentation for either fact.

17.   Ms. Newman told Ms. Katz that the law did not allow her to charge a pet deposit for a service animal.   Katz said that she would not rent the apartment to Ms. Newman without the $1000 deposit.  Ms. Newman expressed doubt that she wanted the apartment under those conditions.  Katz replied that she considered that Ms. Newman was obligated to rent the apartment based on their previous verbal agreement and said she could sue her if she withdrew.

18.   Ms. Newman moved into the Subject Property on or about December 2, 2012.  Her rent was $825 per month, plus a security deposit of $825.  In addition, she paid pet deposits of $1000 for Riley, $250 for Bower, and $100 for Chloe.

19.   Ms. Newman's lease contained a provision in which Ms. Katz reserved the right to charge Ms. Newman $100 for "wasting manager's time" and then listed ten examples of conduct that would give rise to such a penalty.   One

of the examples listed was failing to return Ms. Katz' phone calls within 24 hours.

20.     Riley turned a year old in May of 2013.  Ms. Newman did not ask for a refund of the $1000 deposit at that time.

21.     During 2013, a dog trainer made regular visits to the Subject Property to train Riley in his service functions.  Ms. Newman had told the trainer that she had paid a $1000 deposit for Riley, and that Ms. Katz had promised to return it in May, but had not done so.  At some time after Riley turned a year old, the trainer encountered Ms. Katz and attempted to tell her that she should not charge a pet deposit for Riley because he was a service animal.  Ms. Katz refused to discuss the subject with the trainer, saying that she had her pet policies and would stick to them.

22.     On or about September 4, 2013, Ms. Katz sent a letter to her tenants announcing that the pet deposit would be raised from $100 to $250 per cat, and from $250 to $300 per dog.  Ms. Newman's copy of the letter contained the handwritten note, "Please call me about your younger dog."

23.     On September 10, 2013, Ms. Newman sent a letter to Ms. Katz that she prepared with the assistance of Disability Rights Montana, an advocacy organization.  The letter requested that Ms. Katz refund the $1000 for Riley

after inspecting her apartment for damage.  The letter also informed Ms. Katz that the law prohibited her from charging a deposit for Riley because he was a service dog, and it included supporting materials describing the relevant provision of the law.   The letter asked that the increased deposit for Bower and Chloe be deducted from the $1000 refund.

24.   On receiving the letter described in the previous paragraph, Ms. Katz left a voicemail message for Ms. Newman instructing her to call Ms. Katz back within 24 hours or be charged $100.  When Ms. Newman returned the call, Ms. Katz threatened to evict her for sending the letter.     They arranged a walk-through for September 26.

25.   The walk-through occurred on September 26.  Ms. Newman was accompanied by Sharmon Corner, from Disability Rights Montana.

26.   After inspecting the apartment, Ms. Katz agreed to refund the balance of the $1000 after collecting the new standard $300 deposit for Riley.  Ms. Corner and Ms. Katz said that charging a deposit for a service animal was against the law.  Ms. Katz stated in reply that "a dog is a dog."  Instead, she said to Ms. Newman, "Do you like living here?".   She also stated  that Ms. Newman would be evicted if she did not pay the $300 deposit for Riley.

27.   Following the discussion described in the preceding paragraph, Ms Katz refunded $500 to Ms. Newman, representing the balance of the initial $1000

deposit for Riley after deducting the $300 standard deposit for Riley, an additional $50 for Bower, and an additional $150 for Chloe.

28.    Ms. Newman found the interactions with Ms. Katz with respect to the deposit for Riley extremely stressful.  Although in other respects she was very pleased with the apartment, she decided it would be in her best interest to move out at the expiration of her lease at the end of November.  She sent Ms. Katz notice to that effect on October 28, 2013.   By that time, Ms. Newman had contacted Pam Bean, the executive director of Montana Fair Housing, about the difficulties she was having with Ms. Katz.

29.    On October 31, 2013, Ms. Newman made a request for reasonable accommodation asking that all communications from Ms. Katz be directed to her representative, Pam Bean, the executive director of Montana Fair Housing.   Ms. Newman signed the request and, on October 31, 2013, Montana Fair Housing faxed the request to Ms. Katz.

30.    Later on October 31, 2013, Ms. Katz left a voice mail for Ms. Newman acknowledging that she had received the request, but adding that she was going to disregard it because Ms. Newman was moving out.   Ms. Katz also left an additional message for Ms. Newman on November 1.

31      Subsequently, on November 1, 2014, Ms. Bean sent a letter to Ms. Katz
        reiterating the request that Ms. Katz direct any communications concerning
        Ms. Newman to her.

32.     During a subsequent conversation with Ms. Bean, Ms. Katz threatened to
        charge Ms. Newman $100 an hour for the time she had spent
        accommodating Ms. Katz' request and dealing with Ms. Bean.

33.     As a result of her dealings with Ms. Katz concerning the deposit for Riley,
        Ms. Newman incurred increased stress, anxiety and emotional distress.

34.     As a result of its interactions with Ms. Katz on behalf of Ms. Newman,
        Montana Fair Housing expended staff time and other resources that could
        otherwise have been devoted to other aspects of its mission to further fair
        housing in Montana.

## HUD ADMINISTRATIVE PROCESS

35.     On or about December 2, 2013, Ms. Newman filed a timely Fair Housing
        Complaint against Defendants with the United States Department of
        Housing and Urban Development ("HUD").

36.     On or about December 17, 2013, Montana Fair Housing filed a timely Fair
        Housing Complaint against Defendants with HUD.

37.   Pursuant to 42 U.S.C. § 3610, the Secretary of HUD conducted and completed an investigation of the complaints described in the preceding paragraph, attempted conciliation without success, and prepared a final investigative report.  Based upon the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that Defendants violated the Fair Housing Act.  Therefore, on August 25, 2014, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), charging the above-named Defendants with engaging in discriminatory housing practices on the basis of disability.

38.   On September 5, 2014, Defendants elected to have the claims asserted in the HUD Charge resolved in a civil action pursuant to 42 U.S.C. § 3612(a).  On September 8, 2014, the Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceeding on the complaints of Ms. Newman and Montana Fair Housing.

39.   Following this Notice of Election, the Secretary of HUD authorized the Attorney General to commence civil action, pursuant to 42 U.S.C. § 3612(o).

## VIOLATIONS OF THE FAIR HOUSING ACT

40.   Plaintiff re-alleges and incorporates by reference the allegations set forth

above in paragraphs 1-39.

41.   By the actions set forth above, Defendants have:

a.   Discriminated in the rental, or otherwise made unavailable or denied

dwellings because of disability, in violation of 42 U.S.C. § 3604(f)(1);

b.   Discriminated in the terms, conditions or privileges of the rental of a

dwelling, or in the provision of services or facilities in connection

therewith, on the basis of disability, in violation of 42 U.S.C. §

3604(f)(2);

c.   Refused to make reasonable accommodations in rules, policies,

practices or services, when such accommodations may have been

necessary to afford complainant Kristen Newman equal opportunity to

use and enjoy a dwelling, in violation of 42 U.S.C. § 3604 (f)(3)(B);

and

d.   Coerced, intimidated, threatened, or interfered with the exercise or

enjoyment of  rights granted or protected by the Fair Housing Act, in

violation of 42 U.S.C.

§ 3617.

42.     As a result of Defendants' conduct, Ms. Newman and Montana Fair Housing

have been injured and are "aggrieved persons" as defined by 42 U.S.C. §

3602(i).

43.     The discriminatory actions of the Defendants were intentional, willful, and

taken in reckless disregard of the rights of Ms. Newman.

44.     Defendant ARESM is liable for the actions of its agent, Ms. Katz, described

in this Complaint.


PRAYER FOR RELIEF

WHEREFORE, the United States of America prays for relief as follows:

1.      A declaration that the discriminatory conduct of Defendants as set

forth above

violates the Fair Housing Act;

2.      An injunction against Defendants, their agents, employees,

successors, and all

other persons in active concert or participation with any of them from:

        a.      Discriminating on the basis of disability, in violation of the Fair

Housing Act;

        b.      Failing or refusing to take such affirmative steps as may be

necessary to restore, as nearly as practicable, Ms. Newman, Montana Fair

Housing, and other victims of Defendants' past unlawful practices to the position they would have been in but for the discriminatory conduct; and

      c.    Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices; and

3.    An award of monetary damages to Ms. Newman and to Montana Fair Housing pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1).

The United States further prays for such additional relief as the interests of justice may require.

Dated:  October 6, 2014

ERIC H. HOLDER, JR.
Attorney General of the United States

MOLLY J. MORAN
Acting Assistant Attorney General
Civil Rights Division


____/s/ Steven H. Rosenbaum_____
STEVEN H. ROSENBAUM
Chief
Housing and Civil Enforcement Section
Civil Rights Division

____/s/ Harvey L. Handley_____
TIMOTHY J. MORAN
Deputy Chief
HARVEY L. HANDLEY
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530
Telephone:  (202) 514-4756
Harvey.L.Handley@usdoj.gov

MICHAEL W. COTTER
United States Attorney
District of Montana

    /s/ Megan L. Dishong
Megan L. Dishong
Assistant U.S. Attorney
U.S. Attorney's Office
105 E. Pine
Missoula, MT 59802
Phone: (406) 542-8851
FAX: (406) 542-1476
Email: Megan.Dishong@usdoj.gov